Michael L. Harris appeals from the trial court's summary judgment in favor of Nelson Gill and K.D. Moore in this action to recover damages for personal injury to Harris. This action was brought under Ala. Code 1975, § 25-5-11 (part of the Alabama Workmen's Compensation Act). We reverse and remand.
The summary judgment was proper in this case if there was no genuine issue of material fact and the defendants were entitled to a judgment as a matter of law. Rule 56, A.R.Civ.P. The burden was on the defendants to make a prima facie showing that no genuine issue of material fact existed and that they were entitled to a judgment as a matter of law. If that showing was made, then the burden shifted to the plaintiff to present evidence creating a genuine issue of material fact, so as to avoid the entry of a judgment against him. In determining whether there was a genuine issue of material fact, this Court must view the evidence in the light most favorable to the plaintiff and must resolve all reasonable doubts against the defendants. Wakefield v. State Farm Mutual Automobile Ins. Co.,572 So.2d 1220 (Ala. 1990). Because this action was not pending on June 11, 1987, the applicable standard of review is the "substantial evidence" rule. Ala. Code 1975, § 12-21-12. "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989); § 12-21-12.
After reviewing the evidence before us, we find that the following material facts are not in dispute: At the time of the on-the-job accident made the basis of this suit, from which accident Harris suffered injuries, he had been employed by Coyne Cylinder Company ("Coyne")[1] at its plant in *Page 833 
Huntsville, Alabama, for approximately four months. He worked as a material handler on the second shift in the pressing department, and his duties consisted primarily of material handling and press operation. Harris reported directly to Bill Henderson, the second shift supervisor in the pressing department. Henderson reported to K.D. Moore (a superior of Harris and manager of fabrication operations); and Moore, in turn, reported to Gill (a superior of Harris and vice-president of manufacturing). Gill and Moore generally were responsible for maintaining in a reasonably safe condition the punch press at which Harris was working and generally were responsible for supervising and providing all safety practices and procedures utilized by Coyne.
The punch press on which Harris was injured was originally manufactured by the Hydraulic Press Manufacturing Company of Mount Gilead, Ohio. Coyne had purchased the press from a used equipment dealer in June 1985. It was approximately 40 years old at that time, and it was purchased for use in processing metal footings and collars for cylinders. When the press arrived at Coyne, it was basically unusable. It was neither equipped with nor accompanied by any safety buttons, guards, or devices. Coyne's engineering department had to rewire and rework the press in order to get it operational. In June 1985, when the press first was put into operation at Coyne, it had a panel across the front that had been installed by the engineering department. The panel contained, among other things, palm control buttons to activate the press and an emergency stop button. At that time, the palm control buttons were the only activating device on the press. Sometime thereafter, Coyne began making a new kind of collar for the gas cylinders; the new collars were longer or taller than before. Because of their size, weight, and configuration, these collars would fall off the die when the operator removed his hands to depress the palm control buttons. As a result, in order to keep the collars in place on the die and to punch holes in the collars with the exactness and precision necessary for their eventual use, the operator had to hold the collar firmly in place throughout the operating cycle. The operator could not use his hands to activate the press with the palm control buttons, because it physically was not possible for him to hold the collar in place and depress the palm control buttons at the same time. Subsequently, at some point between June 1985 and early 1987, a foot control pedal (which was equipped with a cover and an elevated pedal to prevent accidental depression) was added to the press as an alternative activating device to enable the operator to activate the press with his foot while holding the collar in place with his hands. Thereafter, either the foot control or the pre-existing palm control buttons could be used to activate the press.
During the five-year period preceding Harris's accident, which occurred on February 27, 1989, safety-related inspections of the press site were conducted by both Coyne's insurance carriers and the Birmingham area office of the Occupational Safety and Health Administration ("OSHA"). Coyne's insurance carriers conducted at least 16 comprehensive loss control surveys during this period, but none of the corresponding reports identified any unsafe conditions concerning the press. The OSHA inspection was conducted at Coyne in January 1988, and Gill personally accompanied the OSHA inspector during that inspection. At Gill's request, Moore ran collars on the press for the OSHA inspector, specifically demonstrating the two-handed nature of the operation and utilizing the foot control pedal to activate the press. During the OSHA inspection, as was true at the time of Harris's injury, there were no barrier guards or other devices to physically prevent the operator's hand from entering the point of operation. Although the OSHA inspector cited Coyne for violations elsewhere in the plant, he issued no citations in connection with the safeguarding or general safety of the press.
Prior to the accident, on at least one occasion, Harris had run the press after Henderson had provided Harris with general *Page 834 
orientation and instruction on the press — Henderson showed Harris the press; explained the press and its operation; advised that there was an on-off switch on the left side of the press; showed the parts (i.e., collars) to be run; showed where to make the cuts; and showed how to cut the parts, by demonstrating the operation, using the foot control pedal to activate the press.
Similarly, on the day of the accident, Henderson assigned Harris to the press, took him to the press, and instructed him how and where to hold and cut the parts, with both hands on the collar to ensure accurate cuts, while activating the press with the foot control pedal. On that day, Coyne was using a new die on the press, which was designed to make rectangular cuts rather than half-moon shaped cuts on the collar, and Henderson had demonstrated the operation to Harris. Thus, on that day, Harris was running collars on the press, using the foot control pedal as the activating device. While standing at the press, Harris would reach into a metal basket to his left to get an unprocessed collar. He then would load the collar onto the die with his hands; hold the collar in place; make a first cut by activating the press with the foot control; align the collar with his hands; hold the collar in place; make a second cut with the foot control pedal; and repeat the process to make a third cut. After completing the process, Harris would remove the collar from the die and drop it into a basket of processed parts to his right. The operation Harris was performing required him to load the collar onto the die with his hands, hold it in place and rotate it on the die during the operating cycle, and then remove it with his hands. Because the particular collar being run by Harris had a curled edge, which threw it off balance so that it would not lie flat on the die set, he had to hold the collar in place against the back of the die set in order to ensure accurate cuts. If he did not follow this procedure, the collars would be mispunched. Because he could not both hold the collar in place and use his hands to activate the press with the palm control buttons, he used the foot control pedal as the activating device. When Harris had made the last cut on the collar he was running, he removed it from the die and threw it into the basket of finished parts to his right. Noticing that a piece that had been cut from the collar had not fallen into the scrap box below the die set, but was lodged inside the die, Harris tried to dislodge the piece from the die set with his right hand while reaching left to pick up an uncut collar. While his fingers were inside the die set at the point of operation, dislodging the piece of scrap, Harris depressed the foot pedal, which activated the press and, as a result, the index and middle fingers of his right hand were amputated.
Following the accident, Harris filed a workmen's compensation claim against Coyne. He received a lump sum settlement for his injury in the amount of $16,906. Coyne's workmen's compensation insurance carrier also paid all of Harris's related medical bills, in the amount of $10,933, as well as temporary total disability benefits in the amount of $1,403. Harris subsequently filed this suit against Gill and Moore personally, seeking damages under Ala. Code 1975, § 25-5-11(c)(1) and (c)(2). The complaint alleged that, as his supervisors, Gill and Moore had caused Harris's injury by failing to provide a safe place to work, by failing to properly supervise Harris's work, by removing proper safeguards with which the press previously had been equipped, and by failing to install a proper safeguard that was designed and available for the press. Gill and Moore filed a motion for summary judgment, asserting in their supporting brief that Harris had failed to establish a genuine issue of material fact under either § 25-5-11(c)(1) (which generally defines "willful conduct" as conduct consciously pursued with a "design, intent and purpose of inflicting injury") or (c)(2) (which specifically defines "willful conduct" as "the willful and intentional removal from a machine of a safety guard or device provided by the manufacturer of the machine with knowledge that injury or death would likely or probably result from such removal"). The trial court granted their motion. Harris appealed. Although *Page 835 
Harris asserted claims under § 25-5-11(c)(1) and (c)(2), on appeal he fails to argue § 25-5-11(c)(1). "[The] failure to argue an issue in brief to an appellate court is tantamount to the waiver of that issue on appeal." Ex parte Riley,464 So.2d 92 (Ala. 1985). Therefore, the propriety of the summary judgment in favor of Gill and Moore as it relates to §25-5-11(c)(1) is not before us. The only issue for our review is whether the trial court erred in entering a summary judgment in favor of Gill and Moore based on its finding that Harris had failed to present a genuine issue of material fact as to his claim under § 25-5-11(c)(2).
Section 25-5-11(c)(2) reads as follows:
"(c) As used herein, 'willful conduct' means:
". . . .
 "(2) The willful and intentional removal from a machine of a safety guard or device provided by the manufacturer of the machine with knowledge that injury or death would likely or probably result from such removal; provided, however, removal of such a guard or device shall not be willful conduct unless such removal did, in fact, increase the danger of the use of the machine and was not done for the purpose of the repair of the machine or was not part of an improvement or modification of the machine which rendered the safety device unnecessary or ineffective."
The safety guard allegedly removed in violation of §25-5-11(c)(2) was the palm control buttons on the punch press. Pursuant to the provisions of § 25-5-11(c)(2) and based on the well-settled law in Alabama, it was incumbent upon Harris to present substantial evidence that Gill and Moore willfully and intentionally removed from the machine the safety guard or device provided by the manufacturer of the machine and did so with knowledge that injury would likely or probably result from the removal. Thus, the specific statutory provision, §25-5-11(c)(2), upon which Harris bases his claim and which defines "willful conduct," sets forth the following four elements that Harris must establish in order for him to make out a prima facie case:
1. The safety guard or device must have been provided by the manufacturer of the machine;
2. The safety guard or device must have been removed from the machine;
3. The removal of the safety guard or device must have occurred with knowledge that injury would probably or likely result from that removal; and
4. The removal of the safety guard or device must not have been part of a modification or an improvement that rendered the safety guard or device unnecessary or ineffective.
Harris contends that because Coyne reconstructed and/or modified the 40-year-old punch press into a new form or with new qualities in order to make it workable and usable, Coyne qualified as a "manufacturer" for purposes of § 25-5-11(c)(2). He argues that this construction of the Act would be consistent with the well-established rule that the Workmen's Compensation Act is to be construed liberally to effect the beneficent purpose of the Act — to require industry to bear part of the burden of disability and death resulting from the hazards of industry, Ford v. Mitcham, 53 Ala. App. 102, 298 So.2d 34 (1974) — and that all reasonable doubts are to be resolved in favor of the claimant. Tiger Motor Co. v. Winslett, 278 Ala. 108,176 So.2d 39 (1965). He bases his contention on the fact that the American National Standard Institute ("ANSI") defines "manufacturer" as "one who manufactures, reconstructs, or modifies" hydraulic presses; on the fact that both his expert and Gill and Moore's expert recognized ANSI as an authority on the care and maintenance of hydraulic presses such as the one on which Harris was injured; and on the fact that Gill and Moore's expert stated that "individuals who have a duty to supervise the safe operation of the hydraulic press [have] to follow [ANSI] standards."
Gill and Moore contend that Harris's claim should fail because Coyne was not the original manufacturer of the punch *Page 836 
press. They contend that this Court should ignore the specialized definition of the term "manufacturer" as set forth by ANSI; that in the absence of a clear legislative intent mandating that result it would be inappropriate to define the term "manufacturer" in § 25-5-11(c)(2), a provision that is applicable to all employers regardless of their industry, by reference to a nonbinding industry standard, such as that adopted by ANSI, which by its terms is limited to the construction, care, and use of hydraulic power presses. Rather, they contend that this Court should recognize the ordinary and generally accepted definition of "manufacturer" — one who is in the business of manufacturing the machine as a finished product or article of trade for use or sale — and, therefore, that this Court should hold that a company that merely reconstructs or modifies a machine for a use incidental to its business, but not for sale in the ordinary course of its business, is not "the manufacturer of the machine" within the meaning of § 25-5-11(c)(2).
The legislature did not define the term "manufacturer" in the Act, and we have found no Alabama cases defining "manufacturer" for the purpose of our analysis under § 25-5-11(c)(2) that are directly on point. Therefore, we exhaustively researched the law of other jurisdictions (specifically that of the State of Minnesota, on whose statutes our workmen's compensation laws are based), but we found nothing definitive to aid in resolving this matter. Therefore, ever mindful of the purpose of §25-5-11 of the Act — to provide employees with a cause of action against co-employees for their willful conduct in the workplace — we thoroughly reviewed the facts before us, thoroughly considered the arguments in the parties' briefs, and concluded that, under the facts of this case, to hold that Coyne was not a manufacturer, when it purchased a 40-year-old punch press that was unusable and unworkable when purchased, and reconstructed and/or modified it into a usable, workable machine, would be contrary to the Act's beneficent purpose. Thus, in construing the facts of this case under §25-5-11(c)(2), we hold that the term "manufacturer" may include not only the original manufacturer (one who produces articles for use or trade), but also a subsequent entity that substantially modifies or materially alters the product through the use of different components and/or methods of assembly.
Having determined that, under the facts of this case, Coyne qualifies as a "manufacturer" under § 25-5-11(c)(2), we must now determine whether Harris presented sufficient evidence that Gill and Moore removed a safety device or guard from the machine.
It is undisputed that the palm control buttons were not physically removed from the machine, but that they remained on the machine after the foot control was added as an alternative activating device so that either the palm control buttons or the foot control could be used to activate the press. It is also undisputed that only one of the controls — either the foot control or the palm control buttons — could be used at one time. Therefore, if Harris was using the foot control at the time of his injury (and the undisputed evidence shows he was), he could not have been using the palm control buttons.
Gill and Moore contend that the "removal" of a safety device or guard from a machine requires more than disabling a control or using an alternative control that makes the other control ineffective. They contend that "removal" requires a physical separation from the machine.
Harris contends that the act of bypassing the palm control buttons, which were the safety device that would have prevented his injury, constituted the "removal" of a safety device or guard.
Thus, the question becomes whether the use of the alternative foot control instead of the palm control buttons constituted a "removal from the machine of a safety guard" within the meaning of § 25-5-11(c)(2) — in other words, even though there was no physical removal of the palm control buttons, but rather an installation of a system designed to bypass the palm control buttons, did such action constitute "removal" within the meaning of § 25-5-11(c)(2)?
The concept of removal — that is, the physical separation — was extended by this Court in Bailey v. Hogg, 547 So.2d 498 *Page 837 
(Ala. 1989),[2] to include the "failure to install" a safety device provided by the manufacturer. The Court found the same dangers present in both situations:
 "The same dangers are present when an available safety guard is not installed as are present when the same guard has been removed. To say that an injury resulting from the willful and intentional removal of a safety guard is actionable but that an injury resulting from the willful and intentional failure to install the same guard is not contravenes that important public policy. To hold that the willful and intentional failure to install an available safety guard is not actionable would allow supervisory employees to oversee assembly of new machinery, instruct their employees not to install the safety guards, and then, when an employee is injured due to the lack of a safety guard, claim immunity from suit."
547 So.2d at 500. See, also, Williams v. Price, 564 So.2d 408
(Ala. 1990) (a case in which we refused to extend the concept of "removal" under § 25-5-11(c)(2) to include instructions pertaining to safety procedures, whether given or not given).
Applying the rationale of Bailey, we hold that the act of "bypassing" a safety device of a particular machine that would prevent an injury — specifically, in the instant case, the act of bypassing the palm control buttons, the safety device on the press that would have prevented Harris from inserting his hand at the point of operation during operation and, thereby, would have prevented the loss of his fingers — is encompassed within the word "removal." As we found in Bailey, supra, to hold otherwise would contravene public policy; it would allow supervisory employees to instruct their employees to perform a certain operation after a safety device related to that operation had been removed — it would allow a supervisor in this case to instruct an operator to cut a particular material on a press by holding the material with both hands and utilizing the foot control, thus requiring the operator to bypass the palm control buttons that constituted the safety device that would have prevented the injury that occurred.
Having determined that the act of bypassing a safety device may constitute "removal", we turn to the question whether Gill and Moore had knowledge that Harris's injury would likely or probably result from such "removal."
In Creel v. Bridewell, 535 So.2d 95, 97 (Ala. 1988), this Court held that "[a] duty to provide co-employees with a safe workplace naturally encompasses a duty to provide co-employees with machines that function properly and safely." Although it is undisputed that neither Moore nor Gill was present in the plant at the time of the accident, the record in this case contains evidence that Gill and Moore's relationship with Harris was in a supervisory capacity; that they were familiar with the punch press, the palm control buttons, and the alternative foot control; that they had observed the press in operation at the plant; that they were aware that when the alternative foot control was being used, the palm control buttons could not be activated; and that they knew or should have known that the safety device had been bypassed and, therefore, posed a safety risk for co-employees, such as Harris, who used it.
Harris presented the following testimony of Gill and Moore concerning their knowledge of the placement of the foot control as an alternative device to the palm control buttons; concerning the claim that when the alternative foot control was operational, it made unavailable the use of the palm control buttons that constituted the safety device to prevent one from placing his hands into the point of operation; and concerning the question whether the proximate cause of Harris's injury was the absence of a safety guard or device from the machine:
(Gill's testimony)
 "Q. [B]ased upon your education and your background, which was the safer *Page 838 
of the type of activating device to be used by an operator on a punch press, a foot activated control or the palm press method?
"A. The palm press method.
"Q. And why is that?
 "A. Well, it ensures that both of your hands are out of the press.
". . . .
 "Q. [You] realize that workers are going to put their hands in presses from time to time, and you knew that based upon your training and background, didn't you?
 "A. Well, we instruct them to turn off the machine.
 "Q. I understand. But you were aware that prior to this incident that these types of accidents do occur and have been known to occur in an industrial plant with an hydraulic press?
"A. Yes."
(Moore's testimony)
 "Q. You commented again on the palm buttons as being the best safety device available to keep the hands away from the punch press.
 "A. No, they are a very good safety device. There are other safety devices.
 "Q. What other safety devices are there that could be utilized, or could have been utilized, on this machine to keep hands or fingers away from the press when it may be activated?
"A. None that we have at the plant.
". . . .
 "Q. And having his hands free and his foot on the foot pedal, he could activate it with his hands near the press; is that correct?
"A. Yes, sir.
 "Q. And you knew that could happen beforehand, didn't you? That was already discussed, that if you get your hands near the pinch area, they are not on the palm button or on some metal, there is the possibility that a finger can get amputated. You are aware of that?
"A. Yes, sir. I had no reason to assume it would."
Harris also presented the following sworn testimony of his expert witness as to the "removal" of the palm buttons, as to the probability of injury, and as to the question whether such "removal" was done for the purpose of repairing the machine or as a modification of the machine that rendered the safety device ineffective or unnecessary:
 "Based upon my review of the [facts of this case] and further based upon my years of experience in industry safety, . . . specifically, the guarding of hydraulic power presses, coupled with my knowledge of the applicable industry standards as set forth by OSHA, [ANSI], and the National Safety Council, it is my opinion . . . that the palm control buttons being deactivated . . . removed the only safety guard or device on the machine at the time [Harris] was caused to be injured. . . . [The] deactivation of the palm control buttons increased the danger of the use of the machine to the operator and, in my opinion, was not done . . . [as] part of an improvement or modification of the machine which rendered the safety device unnecessary or ineffective. . . . [The] deactivation of the palm control buttons by a switch removed the features of the palm control buttons as a safety device. Such removal gave notice to the management or supervisor in charge of the safety of such machine knowledge that injury . . . would likely or probably result from such removal. In fact, it is my opinion that [Gill and Moore], assuming that they were reasonable men, by allowing . . . the deactivation of the [palm control buttons] would have known that injury, such as the amputation of fingers to [Harris], was substantially certain to follow by allowing . . . such deactivation of the palm control buttons.
". . . .
 "Being that the hydraulic press in question was purchased in a totally unusable *Page 839 
condition, . . . [Gill and Moore] would then have [had] to meet the OSHA and ANSI standards in the reconstruction of the machine. . . . A foot control is not a safety device or safety guard and, in fact, when a foot control is utilized to activate a power press, it is required by the OSHA and ANSI standards that other safety devices or safety guards be utilized to guard the point of operation and prevent an operator, such as [Harris], from entering his hands or body parts into the point of operation. A safety device recognized by the ANSI and OSHA standards is palm control buttons.
 "The palm control buttons removed by [Gill and Moore], . . . were a safety device . . . designed to prevent . . . [Harris] from entering his hands at a pinch point at the point of operation of the hydraulic power press . . . wherein [Harris] was caused to have his fingers amputated. . . . In my opinion, based upon the review of [the] deposition[s] [of Harris, Gill, and Moore] . . ., the affidavits of other witnesses, photographs, videotapes and the applicable industry standards, including [OSHA and ANSI] standards, it is my opinion that [Harris's] . . . fingers were caused to be amputated as a proximate result of the removal of the safety device or palm control buttons."
(Emphasis added.)
Based on the foregoing, after reviewing the record in the light most favorable to Harris and resolving all doubts in his favor, we hold that the trial court erroneously entered the summary judgment in favor of Gill and Moore on Harris's claim under § 25-5-11(c)(2). Therefore, we reverse and remand for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HORNSBY, C.J., and MADDOX, KENNEDY and INGRAM, JJ., concur.
[1] Coyne Cylinder Company, a wholly owned subsidiary of Thermadyne Industries, Inc., manufactured metal cylinders for gaseous substances used primarily for welding purposes.
[2] Although the author of this opinion dissented in Bailey v.Hogg, 547 So.2d 498 § (Ala. 1989), disagreeing with the rationale of the Court in its holding, that holding is the law, and the author is bound by stare decisis to follow that law and is bound to follow any rational and logical extension thereof.