This appeal raises an issue of the liability a paper mill owner for injuries incurred by a truck driver who was an employee of an independent contractor. Edward Dempsey sued for damages, alleging that Mead Coated Board, Inc., had negligently or wantonly caused his personal injury, and his wife, Rebecca Dempsey, made a derivative claim for loss of consortium. Dempsey, as driver of a truck, was injured while unloading logs from his truck at Mead's paper mill. The issues presented are (1) whether Mead owed Dempsey a duty of care, (2) whether there was substantial evidence that Mead knew that injury was likely to result from the unloading practices at its paper mill, (3) whether the trial court erred in allowing into evidence OSHA regulations that the defendant Mead claims were not applicable to its paper mill, (4) whether the punitive damages award is permissible under § 6-11-20, Ala. Code 1975, and (5) whether a remittitur should be ordered because of bias, passion, and prejudice on the part of the jury.
Dempsey was first employed by Pine Oak Products in 1984. He hauled "long logs"[1] to various paper mills and sawmills around the Southeast, including the paper mill owned and operated by Mead. On July 18, 1989, Dempsey had delivered a load of long logs for Pine Oak to Mead's paper mill. He had been delivering long logs to Mead's paper mill for at least four years. Dempsey owned the tractor part of the truck he was driving, and Pine Oak Products owned the trailer part. The trailer was equipped with eight standards, or uprights, four on either side of the trailer. Binder chains were crossed over the logs between the standards to hold the *Page 874 
load of logs in place on the trailer. Upon entering the paper mill premises, drivers delivering logs stop at the scale house for their trucks to be weighed. Mead had a rule against releasing the binder chains from the load either before the truck got on the scales or while it was on the scales. Mead also checked the logs at the scales, and the workers at the scales had authority to refuse admission to a driver whose load did not meet its specifications. After being weighed, the trucks proceed to the unloading area. In the unloading area, trucks are unloaded by a piece of machinery called a "LeTourneau." James J. Storey, the owner of Pine Oak Products, testified that it was the practice at Mead for drivers to release their binder cables while waiting for the truck in front of them to be unloaded. Dempsey testified that he was told when he began delivering logs to Mead that he had to have all of his binder cables off or his truck would not be unloaded. Dempsey said that when he told the operator of the unloading equipment that he had never heard of such a practice the operator told him that that was just the rule there. Dempsey stated that in order to get his logs unloaded he would always thereafter release his binder cables before pulling into the unloading area. Dempsey's brother-in-law also testified that the operator of the unloading equipment told him after Dempsey's accident that the policy was not to unload a truck until the driver had removed all of the cables. However, the wood yard supervisor and the "LeTourneau" operator for Mead testified that, upon request of the driver, the operator of the unloading equipment would secure a load before the front binder chain was released. There was also evidence that Mead's sawmill and sawmills and paper mills owned by other companies allowed or required drivers to keep the front cables on loads until they were secured by the unloading equipment.
When Dempsey's truck was approximately the sixth in line waiting to be unloaded by the "LeTourneau" unloading equipment, Dempsey released the binder cables. Some logs on his truck were stacked above the standards on the passenger side. A log fell off the passenger side of the truck, striking and injuring Dempsey.
The jury awarded Dempsey $75,000 in past damages, $225,000 in future damages, and $1 million in punitive damages. The jury also awarded Dempsey's wife $60,000 in past damages and $140,000 in future damages for loss of consortium. Thus, the total verdict for the Dempseys was $1.5 million. Mead moved for a J.N.O.V., or, in the alternative, a new trial or a remittitur. The trial court denied Mead's motion.
This Court has noted the presumption of correctness attached to a jury verdict:
 "A strong presumption of correctness attaches to a jury verdict in Alabama, if there is sufficient evidence to support the verdict. In short, the verdict must pass the 'sufficiency test,' which is presented by motions for directed verdict and j.n.o.v. Christiansen v. Hall, 567 So.2d 1338, 1341 (Ala. 1990); Alpine Bay Resorts, Inc. v. Wyatt 539 So.2d 160 (Ala. 1988). This presumption of correctness is further strengthened by a trial court's denial of a motion for new trial. Christiansen, 567 So.2d at 1341. Denying, or, to a more limited extent, granting, a motion for new trial is within the sound discretion of the trial court. See, Jawad v. Granade, 497 So.2d 471, 477 (Ala. 1986). This Court will not reverse a judgment based on a jury verdict on a sufficiency-of-the-evidence basis unless the evidence, when viewed in a light most favorable to the nonmovant, shows that the verdict was 'plainly and palpably wrong and unjust.' Christiansen, 567 So.2d at 1341."
Smalley Transp. Co. v. Bay Dray, Inc., 612 So.2d 1182,1185-86 (Ala. 1992).
Mead contends that it owed no duty to Dempsey because Dempsey was the employee of an independent contractor. It is undisputed that Pine Oak was an independent contractor and that Dempsey was employed by Pine Oak. Although a premises owner generally owes no duty of care to employees of an independent contractor with respect to a working condition arising during the progress of the work on the contract, this general rule does not apply when the premises owner retains or reserves the right to control the manner in which the independent *Page 875 
contractor performs its work. Pope v. City ofTalladega, 602 So.2d 890, 892 (Ala. 1992); Weeks v.Alabama Elec. Co-op., Inc., 419 So.2d 1381 (Ala. 1982);Thompson v. City of Bayou La Batre, 399 So.2d 292, 294
(Ala. 1981). " 'When the right of control is reserved, the relationship changes from one of premises owner and independent contractor to that of master and servant.' " Weeks, 419 So.2d at 1383 (quoting Thompson, 399 So.2d at 294).
Mead contends that there is no evidence of control by it. We find otherwise. There was testimony that Mead employees would turn a truck around if it did not comply with Mead's specifications and that Mead employees instructed loggers not to take their binder cables off while their loads were being weighed. Dempsey testified that he was told by Mead's unloading machine operator that his load would not be unloaded until the cables were removed. Dempsey's brother-in-law testified that the unloading machine operator told him that the policy at Mead was not to unload a truck until all the cables had been removed, and the operator admitted that he would not unload a truck until the cables were removed. There was also other testimony that the policy at Mead was to require the removal of binder cables before unloading the truck. Henry Burnett, the wood yard supervisor, testified that he had the authority to put in force rules requiring that the cables stay attached until the load was secured by unloading equipment. On this evidence, it would be reasonable for a jury to conclude that Mead retained or reserved the right to control the manner in which Dempsey performed his work on its premises and, therefore, to conclude also that Mead owed Dempsey a duty to provide safe working conditions.
Mead claims that it was entitled to a judgment as a matter of law on Dempsey's wantonness claim, because, it argues, Dempsey failed to prove that it knew that injury would likely or probably result from the unloading practice of releasing the cables before securing the load with the unloading equipment. Mead correctly points out that "wantonness requires some degree of consciousness on the part of the defendant that injury is likely to result from an act or omission." Coca-ColaBottling Co. v. Stripling, 622 So.2d 882, 884 (Ala. 1993). The evidence from which the jury could have inferred such consciousness or knowledge included testimony regarding relevant OSHA regulations and testimony by Mead's wood yard supervisor, Henry Burnett, that it would be safer to take the cables off with the unloading equipment securing the load.[2]
Larry Miller, an employee of Mead's sawmill, which is located adjacent to the paper mill and which received long logs in an area very similar to the area in which the paper mill received them, testified that he always instructed loggers whose loads were over the standards to leave one cable on "[s]o a log wouldn't roll off and hurt somebody." Dempsey also testified that he always left his front cable on when delivering long logs to Mead's adjacent sawmill. On this evidence, a *Page 876 
jury could reasonably conclude that Mead had the degree of consciousness of probability of injury required to prove wantonness.
Mead also contends that the trial court erred by permitting Dempsey's expert witness, Wayne McCain, to testify at trial regarding the OSHA regulations at 29 C.F.R. § 1910.265
(1988) governing the operation of sawmills. Mead argues that this section applies only to sawmills and is thus irrelevant to this case, because Dempsey was injured at Mead's paper mill. McCain testified that, considering the fact that Mead owned and operated a sawmill and a paper mill adjacent to each other and the fact that both were unloading the same type of logs, then under the terms of the general applicability section,29 C.F.R. § 1910.5 (1988), the paper mill was required to comply with both 29 C.F.R. § 1910.261 (1988), which applies to paper mills, and 29 C.F.R. § 1910.265 (1988), which applies to sawmills.
Mead correctly states that evidence regarding inapplicable regulations or an inapplicable standard of care should not be admitted into evidence. See Wal-Mart Stores, Inc. v.White, 476 So.2d 614, 618 (Ala. 1985) (holding that an expert witness's testimony regarding a higher standard of care than the standard imposed by law was improperly admitted).See also, Renfro v. Georgia Power Co., 604 So.2d 408,413 (Ala. 1992) (holding that testimony regarding an inapplicable OSHA regulation was not substantial evidence of a duty owed by the defendant). We need not express an opinion as to whether the testimony regarding the OSHA regulations in this case was proper or not, because the defendants did not preserve this issue for appeal by making a timely objection to the testimony. See Macon County Comm'n v. Sanders,555 So.2d 1054, 1058 (Ala. 1990) ("Even if the evidence was inadmissible, the error was not preserved for review because the defendants did not object. . . ."); Hinson v.King, 603 So.2d 1104, 1105 (Ala.Civ.App. 1992) ("A timely objection is a condition precedent to assigning the admission of such an answer as grounds for error on appeal.");Goodson v. State, 540 So.2d 789, 791 (Ala.Crim.App. 1988) ("In order for this court to review an alleged erroneous admission of evidence, a timely objection must be made to the introduction of the evidence, specific grounds for the objection should be stated and a ruling on the objection must be made by the trial court."). See also, Pettway v.State, 607 So.2d 325, 331 (Ala.Crim.App. 1992) (" 'To be timely, an objection must be interposed as soon as the ground for the objection becomes apparent.' . . . Similarly, a motion to exclude certain testimony of a witness comes too late when it is made at the end of the examination of that witness."). The only objections made by defense counsel to McCain's testimony were made on the ground that McCain was not qualified to testify as an expert or related to a couple of questions not related to the OSHA regulations. In fact, on cross-examination the defense counsel questioned McCain about the OSHA regulations that apply to sawmills. The defendant cannot now complain that McCain's testimony about the regulations should have been excluded.
Mead contends that the award of punitive damages was error because, it argues, Dempsey did not prove by "clear and convincing evidence" that it "consciously or deliberately engaged in . . . wantonness or malice with regard to the plaintiff," as required by § 6-11-20(a), Ala. Code 1975. The evidence of wantonness, already discussed in this opinion,[3]
is sufficient to produce in the minds of the jurors "a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion"; thus, it meets the clear and convincing standard. § 6-11-20(b)(4), Ala. Code 1975. We therefore hold Mead's argument to be without merit.
Finally, Mead contends that the judgment should be affirmed only on condition that Dempsey file a remittitur, because, Mead argues, the verdict was rendered on the basis of bias, passion, and prejudice of the jury. Mead argues that the jury award has little to do with the care Mead used in overseeing the unloading of trucks and that it reflects, instead, the jury's reaction to a disfigured plaintiff who had suffered serious *Page 877 
injuries in an accident unrelated to this case. Mead contends that the verdict is grossly excessive and is greatly disproportionate to the gravity and nature of its alleged wrongdoing or to any amount reasonably necessary to prevent a similar wrong in the future. We disagree. The trial court adequately addressed the factors of § 6-11-23, Ala. Code 1975, Green Oil Co. v. Hornsby, 539 So.2d 218
(Ala. 1989), and Hammond v. City of Gadsden,493 So.2d 1374 (Ala. 1986), in its order on the post-trial motion. Of particular note, the trial court found that the amount of punitive damages was twice the amount of compensatory damages, that there was no evidence that Mead had changed its unloading procedure, and that it was desirable to discourage both Mead and others from using the unloading procedure used in this case. The court also found that there was no evidence that the award would destroy Mead financially. We conclude that the trial court's analysis is sound and that the punitive damages award was not excessive.
Based on the foregoing, we affirm the judgment of the trial court.
AFFIRMED.
HORNSBY, C.J., and SHORES, STEAGALL and INGRAM, JJ., concur.
[1] Long logs are entire trees and are not uniform in length.
[2] Mr. Burnett's testimony with regard the higher degree of safety of releasing binder cables with the load secured by the unloading equipment was as follows:
 "Q. Now, . . . at line four . . . I said, 'Do you know — well, let me ask it this way: Wouldn't it be fair to say that having your unloading equipment secure the load and get position to lift it off, whether it's the [LeTourneau] Electro Stacker or whether it's your crane, before the drivers unlease [sic] their cables, wouldn't it be safer in case it happens to be some logs above standards preventing an accident [sic]?' And what was your answer? Start at line thirteen.
 "A. 'With the LeTourneau, if they are above the standards, yes, it would be safer to take the cables off with the grappler on the logs.'
 "Q. Okay. And then I jumped, on the question at line sixteen says, 'Let's just take Mr. Dempsey's, for example. Assuming it was loaded above the standards, if there had been a procedure or requirement that he not release his cables until the [LeTourneau] Electro Stacker got positioned around his logs, and then he released his cables, would that not have been a safer practice than what he actually did?'
 "MS. SMITH: Your Honor, I objected to that at the time on the grounds that that was not the rule in place.
"THE COURT: Overruled at this point.
 "Q. At line — what was your answer, starting at line twenty-five?
 "A. 'If he had pulled into the staging area and allowed us to put the mast, the hoist, or the LeTourneau around the logs, yes, it would have been safer, before he unhooked his cables. It would have been safer.' "
[3] See supra note 2 and accompanying text.