Steve DANIELS, Jennifer
Daniels, Plaintiffs.

v.

MEAD COATED BOARD, INC., a subsidiary of the Mead Corporation; Randy Fulkerson, Defendants.

Civ. A. No. 93–D–753–E.

United States District Court,
M.D. Alabama,
Eastern Division.

June 3, 1994.

J. Farrest Taylor, Dothan, AL, and L. Merrill Shirley, Elba, AL, for plaintiffs.

James N. Walter, Jr., Clement Caly Torbert, III, Montgomery, AL, and Sydney F. Frazier, Jr., Birmingham, AL, for defendants.

## MEMORANDUM OPINION AND ORDER

De MENT, District Judge.

This matter is now before the court on defendant Mead Coated Board, Inc.'s motion for summary judgment and brief in support thereof, filed January 24, 1994. Plaintiffs Steve and Jennifer Daniels filed a brief in opposition on February 10, 1994. Also before the court is defendant Randy Fulkerson's motion for summary judgment and brief in support thereof, filed January 26, 1994. The plaintiffs filed a brief in opposition on February 14, 1994.

For the reasons explained below, both defendants' motions for summary judgment are due to be granted.

### SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the exis-

tence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The trial court's function at this stage of the case is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

## FACTS

Mead Coated Board, Inc. ("Mead") contracted with CBI NaCon, Inc. (CBI) to build a storage tank at Mead's Marht, Alabama facility. Steve Daniels was an employee of CBI, who was assigned to the Mead project, and Randy Fulkerson was Daniels' immediate supervisor.

On or about July 19, 1991, Daniels was working in the storage tank area. To reach a particular section of the tank, Fulkerson instructed Daniels to use a ladder, which was located on a scaffold. While Daniels was on the ladder, it was not secured by "tie offs," but was held into place by a second worker, who was standing at the base of the ladder. While Daniels was on the ladder, the second worker was called away to assist in another area of CBI's construction project. At that time, the ladder slid out from under Daniels, causing him to fall approximately twenty-eight feet onto a concrete floor and to be injured.

Plaintiff Daniels alleges that the ladder on which he was standing had been modified because the rubber cleats had been removed from the bottom of the ladder, the "tie offs" had been removed, and the section of ladder

on which Daniels had climbed had been removed from a longer extension ladder.[1] As a result of those alleged modifications, Daniels charges defendant Randy Fulkerson with violating *Code of Alabama* § 25–5–11(c)(2) (1992).

In addition, plaintiff Daniels charges that Mead had undertaken "the responsibility for the safety of the workplace and that Mead was negligent in the performance of [that] responsibility." (Pretrial Order at 3 (Pls.' Contentions)).

Lastly, as to both defendants, plaintiff Jennifer Daniels alleges that as a result of each defendants' actions and the resulting injury to her husband, she suffered loss of consortium and loss of her husband's services.

## DISCUSSION

### A.  Defendant Mead Coated Board, Inc.

The general rule in Alabama is that "a premises owner owes no duty of care to employees of an independent contractor with respect to working conditions arising during the progress of the work of the contract." *Weeks v. Alabama Elec. Co-op., Inc.,* 419 So.2d 1381, 1383 (Ala.1982). " 'The general rule does not apply, however, if the premises owner retains or reserves the right to control the manner in which the independent contractor *performs its work.*' " *Weeks,* 419 So.2d at 1383 (quoting *Thompson v. City of Bayou La Batre,* 399 So.2d 292 (Ala.1981)). "When the right of control is reserved, the relationship changes from one of premises owner and independent contractor to that of master and servant." *Id.* (quoting *Thompson,* 399 So.2d at 294).

▮ In order to determine the status of the relationship between Mead and CBI, the court must examine the written contract and the actions of the parties pursuant thereto. *See Pate v. United States Steel Corp.,* 393 So.2d 992, 994 (Ala.1981). The purchase order, which embodies the contract between Mead and CBI, is clear, unambiguous, and contains the following language:

---

1. The plaintiffs seem to have abandoned their claim that the ladder was merely a portion of a longer extension ladder as it is not argued on the motion for summary judgment.

7.  In the even this order covers the furnishing of labor or the performance of any work, Seller [CBI] shall be an independent contractor therefor, and:

.   .   .   .   .

(b) Seller [CBI] will be exclusively responsible for the injury or death of any person and the damage or destruction of any property resulting from or arising out of the performance of the work, and shall indemnify, hold harmless and defend this Company, the Buyer, from any and all claims, causes of action, actions, losses, expenses and judgments on account of any such injury, death, damage or destruction, except such as are caused exclusively by this Company's negligence, ...

(Def.'s M.Summ.J. at Exh. B.) It is clear from the contract that Mead neither had retained a right to control CBI employees nor had corresponding a duty to provide them with safe working conditions. The terms of the contract dictated that CBI was totally responsible for the safety of its workers.

Therefore, the issue becomes whether Mead attempted to control or actually controlled the activity which led to Daniels' injury. The plaintiffs have submitted no evidence that indicates that Mead owned the ladder on which Daniels was standing, that Mead directed Daniels' involvement in the construction project, or that Mead participated in the construction of the storage tank in any way. The only evidence of Mead's direct participation in the project is that Mead engineers visited the construction site daily to monitor CBI's progress and to insure that the construction complied with the specifications contained in the contract. When asked if he ever received any supervision from a Mead employee, plaintiff Daniels responded, "No." (Daniels' Dep. at 249.)

In *Pate v. United States Steel Corporation*, 393 So.2d 992 (Ala.1981), the employees of a contractor sued a premises owner to recover for injuries sustained in a fall from a scaffold. At the time of the accident, the scaffold had no safety lines or other safety devices. Similarly to the present case, the *Pate* plaintiffs alleged that the defendant negligently failed to provide a safe place to work, because the defendant failed to provide an adequate and safe scaffold with the appropriate safety devices. At the time of the contract, United States Steel Corporation (USS), the owner of the premises, had given Foster, the employer of the plaintiffs, a safety manual with which Foster, as a contractor, would be required to comply. In addition, the contract provided that the relationship between USS and Foster would be that of a owner and independent contractor not that of a master and servant. USS's participation in the construction consisted of daily visits to the site and holding weekly meetings to review progress on the construction project, to plan work, and to coordinate contractors. The plaintiffs argued that by USS's considerable involvement over the project rose to the level of control over the manner in which the project was completed, i.e., *control over the manner in which the contractors did their work*, making USS liable for the breach of the duty to provide a safe work environment.

First, the Supreme Court of Alabama pointed out that the critical issue in the case was whether USS had control over the *manner* of construction. The court held that USS's actions merely indicated a "concern that the results contemplated by the contract were achieved." *Pate*, 393 So.2d at 995. According to the court, concern that the proper results of a contract are achieved is a legitimate one. *Id.* The court further held that USS's participation did cause them to fall into the exception to the general rule that premises' owners do not owe a duty to independent contractors. In describing this phenomenon, the court quoted the following:

The mere retention by the owner of the right to supervise or inspect work of an independent contractor as it progresses, for the purpose of determining whether it is completed according to the plans and specifications, does not operate to create the relation of master and servant between the owner and those engaged in the work. This rule is not altered by the fact that the employer may stop work which is not done properly.

*Id.* (quoting 41 Am.Jr.2d *Independent Contractor* § 10 (1968) (footnotes omitted)).

From the court's decision in *Pate* and from its decisions in other cases, it is clear that the general rule in Alabama is that the mere monitoring of work of an independent contractor to ensure contract compliance does not constitute control. *Alabama Power Co. v. Williams,* 570 So.2d 589 (Ala. 1990) (holding also that property owner's contractual right to enforce safety rules if violation is observed on site of work by contractor does not alone constitute voluntary assumption of duty to inspect for safety). Moreover, the right to inspect or supervise a project to ensure compliance with the terms of the contract does not change the relationship of an owner and independent contractor to one of a master and servant. *Pugh v. Butler Tel. Co.,* 512 So.2d 1317, 1318 (Ala. 1987) (holding that there must be more than a mere retention of a right to inspect, but a retention of a right to control the manner of performance to create a master-servant relationship).

There is no evidence that Mead's participation in the construction project involved anything more than inspecting the work done to insure compliance with the specifications of the contract. No evidence has been submitted to the court that Mead had any control over the manner in which CBI carried out its work. In addition, no evidence has been submitted to the court that indicates that Mead or any of its employees had any control whatever over plaintiff Daniels from the time he began working on the site until the time of his accident.

The plaintiffs argue in opposition to summary judgment that *Tittle v. Alabama Power Co.,* 570 So.2d 601 (Ala.1990), supports his contention that Mead exercised control over the manner in which CBI performed the work contracted for, i.e., the building of the storage tank. In *Tittle,* there was evidence that Alabama Power Company employees gave instructions to the contractor's employees on how to do the work involved and that there was a constant "flow" of Alabama Power employees around the project. The supreme court held that the degree of control exercised by Alabama Power was sufficient to impose on them the duty to provide a safe workplace. *Tittle,* 570 So.2d at 608.

The facts in *Tittle* are very different from the facts in the present case. First, there is no evidence that Mead employees gave orders to CBI employees. In fact, Daniels testified that to his knowledge no Mead employees had neither inspected the ladder upon which he was standing (Daniels' Dep. at 251) nor had he received any safety instructions from a Mead official other than an admonition to watch out for a load moving over Daniels' head. (Daniels' Dep. at 249.) With the exception of general safety requirements, such as requiring all workers entering the plant to have a hard hat, steel toe boots, and glasses, Daniels received no other direct safety instructions from Mead.

The plaintiffs also argue that Mead took steps after the accident involving Daniels to rectify the alleged unsafe conditions in which Daniels had been working. In an internal accident report, Mead listed measures that could be taken to remedy the circumstances surrounding Daniels' accident and prevent other similar mishaps. Daniels maintains that these corrective measures were subsequent remedial measures and are proof that Mead had undertaken the duty to maintain a safe workplace, not only for their employees, but for CBI employees. In further support of his contention, Daniels quotes a colloquy from Lee Shankle's deposition. Mr. Shankle is a Mead corporate representative, and his testimony indicates that no corrective measures were prescribed on CBI's accident report, as was the case in Mead's report. (Pls.' Br. in Opp. to M.Summ.J. at 5–6.) Daniels argues that because CBI did not recommend any corrective measures in its report, but Mead did, the absence of recommendations by CBI indicates that Mead had control over the safety conditions of the project for which CBI was the contractor. The court finds that the plaintiffs' argument is unpersuasive. Although inventive, the plaintiffs have cited no case law to suggest that an internal accident report recommending corrective measures can be considered as a matter of law a subsequent remedial measure which indicates control over a construction site. There is no evidence that Mead ordered CBI to take the corrective measures included in Daniels' accident report. There-

fore, there is no evidence that subsequent remedial measures were under taken.

Even if Mead did order that corrective measures be taken, the court finds that in so doing Mead would not have assumed the duty to provide a safe workplace for CBI employees. The contract between Mead and CBI dictated that CBI was required to follow the safety standards maintained at the Mead location while CBI was performing their work. As a result of the provisions of the contract, Mead had the right to order CBI to maintain certain standards of safety, but in holding the right, Mead did not acquire a duty to do so. The court finds that Mead had the right to order CBI to take corrective steps, and that regardless of whether Mead chose to exercise that right, Mead did not have the duty to do so.

■ Daniels also argues in opposition to the Mead's motion for summary judgment that Mead had control over the project because Mead gave each contractor a safety manual with which each contractor had to be in compliance during the performance of their contract. According to Daniels, the fact that Mead made CBI comply with their safety manual, as they did all contractors, dictated that Mead had undertaken the duty to provide a safe workplace. In support of their argument, the plaintiffs cite *Tittle v. Alabama Power Company*, 570 So.2d 601 (Ala.1990).[2] The safety manual which Mead gave all to all contractors stated on page three that

> The following information is provided to the Contractor by MEAD with the understanding that these are guidelines for safe work practices while performing the work and are not intended in any way to be all-inclusive or to relieve the Contractor of any of the responsibility for the safe performance of the work outlined int eh Forward of this document.... In all cases, the contractor and/or any other contractor of subcontractor shall be deemed to be an independent contractor and the sole employer of its employees.

(Pls.' Exh. B at 3.) It seems the plaintiffs argument directly contradicts the Supreme Court of Alabama's holding in *Pate v. United States Steel Corporation*, 393 So.2d 992, 996 (Ala.1981), which held that absent any other direct involvement requiring contractors to comply with a safety manual while performing their contracts does not indicate that the owner had a duty to inspect and provide a safe work environment, but only the right to do so if they so chose. In the present case, no evidence of other direct involvement has been presented. Therefore, the court finds that Mead's requirement that CBI comply with a safety manual alone, without more direct involvement in the progress and actual work involved, does not constitute control to a degree which mandates that Mead had a duty to provide a safe work environment for CBI employees.

Lastly, the plaintiffs, in a supplemental response, submitted to the court a recently rendered decision of the Supreme Court of Alabama, *Mead Coated Board v. Dempsey*, 1994 WL 154660, No. CV–91–26 (Ala. April 29, 1994). In *Dempsey*, the plaintiff was employed as a truck driver for a logging company who sold "long logs" to Mead Coated Board. After reaching the plant, Mead, according to Dempsey, had a policy of requiring drivers to have all cables removed from their load prior to reaching the unloading point. Dempsey's truck was loaded with logs rising above the standards on the trailer, and as a result, when he removed all the supporting cables, a log fell from the truck, striking him, and causing him considerable injuries. Mead employees were integrally involved in the unloading process, directing the flow of trucks as well as operating machinery which unloaded the logs. The court held on those facts that Mead had assumed a duty of care toward Dempsey, because their involvement was so expansive in the operation and because that involvement was endemic of control. The plaintiffs cite *Dempsey* and argue that the facts of the present case are similar. The court finds that the characteristics of control involved in *Dempsey* are not present in the case at hand. There is no evidence

**2.** As the court noted earlier, the facts in *Tittle* were somewhat different from the facts in the present case.

that Mead was directly involved in the manner in which CBI performed its work. There is no evidence that Mead employees in any way directed the operation during which Daniels was injured. There is no evidence that Mead employees inspected the ladder on which Daniels was standing to determine if it was safe or not. Therefore, the court finds that the facts in *Dempsey* and the present case are distinguishable and thus, the case is not germane to the court's inquiry as to whether summary judgment should be granted in this case.

The court finds that Mead in no way exercised or attempted to exercise any control over the manner in which CBI attempted to complete its work. Therefore, in accordance with the dictates of the Supreme Court of Alabama in *Pate* and the other cases cited above, summary judgment in favor of defendant Mead is due to be granted.

*B. Defendant Randy Fulkerson*

The plaintiffs charge Fulkerson with willfully removing a safety device in violation of *Code of Alabama* § 25–5–11(c)(2). Section 25–5–11(c) makes unlawful "the willful and intentional removal from a machine of a safety guard or safety device provided by the manufacturer of the machine with the knowledge that injury or death would likely or probably result from removal." Accordingly, Daniels claims that defendant Randy Fulkerson, his supervisor and fellow employee at CBI, intentionally removed the boots or cleats, which had been installed by the manufacturer, from the ladder which Daniels was using at the time of his accident. Daniels further claims that the "tie offs" used to secure the ladder had either been removed or that CBI had failed to install them. As to both the boots and "tie offs," Daniels claims Fulkerson acted willfully in removing the devices and with the knowledge that there

removal would likely cause Daniels to be injured.

In *Harris v. Gill*, 585 So.2d 831 (Ala.1991), the Supreme Court of Alabama held that a prima facie case for a violation of § 25–5–11(c)(2) is as follows:

1. The safety guard or device must have been provided by the manufacturer of the machine;
2. The safety guard or device must have been removed from the machine;
3. The removal of the safety guard or device must have occurred with knowledge that injury would probably or likely result from that removal; and
4. The removal of the safety guard or device must not have been part of a modification or an improvement that rendered the safety guard or device unnecessary or ineffective.

*Harris*, 585 So.2d at 835.

First, to establish a prima facie case, a plaintiff must present evidence that a safety device was provided by the manufacturer. It appears to be undisputed that cleats or boots were provided by the manufacturer as safety devices on the bottom of the ladder. However, as to the "tie offs," plaintiff Daniels testified that the "tie offs" did not come from the manufacturer nor were they added as permanent addition to the ladder by Mead.

■ Secondly, as to the intentional removal of the safety devices, there is no evidence that rubber cleats or boots were removed from the bottom of the ladder. In his deposition, when asked if the rubber boots were on the bottom of the ladder at the time of the accident, Daniels testified that he did not remember. (Daniels' Dep. at 126, 196.)[3] In support of his motion, defendant Randy Fulkerson in his affidavit stated that the boots were on the ladder at the time of the accident and provided a picture of the ladder immediately following the accident which in-

---

**3.** In his deposition, Daniels testified as follows:

> Q. You've told me before that, A, you could not tell me for certain whether or not his ladder had feet on it or not. You've told me that three times today in this deposition.
> A. Yes, sir.

(Daniels' Dep. at 196.) Also, later in his deposition, Daniels testified as follows:

> Q. Are you able to say that the ladder you fell off of is this ladder that you saw rubber cleats being taken off it?
> A. I can't say a hundred percent that it was because I don't want to lie about nothing. I'm just telling you that's—to me that's what it was, you know, because I—that I just don't—

(Daniels' Dep. at 198.)

dicates that the boots were still in place at the bottom of the ladder where they had been installed by the manufacturer. The court finds that there is no evidence that the safety boots were not in their proper place at the time of the accident.

■ As to the "tie offs," it appears undisputed that "tie offs" were not placed on the ladder by the manufacturer. Defendant Fulkerson argues that there is no duty to add safety guards that the manufacturer fails to provide and cites *Burkett v. Loma Machine Manufacturing,* 552 So.2d 134, 138 (Ala.1989) in support thereof. The plaintiffs argue that Fulkerson should be considered a "manufacturer" because he, as an employee of CBI, added tie-offs to the ladder in other situations. *See Harris v. Gill,* 585 So.2d 831, 836 (Ala.1991). However, the court has been unsuccessful in locating any evidence that "tie offs" were added to the ladder in this instance so as to constitute a material modification or alteration such that Fulkerson or CBI could be considered a "manufacturer." [4] Plaintiff Daniels testified that he was aware that "tie offs" were available and often used (Daniels' Dep. at 67–68, 157–58),[5] but that a "tie off" was not being used while he was on the ladder. Although Fulkerson testified that "tie offs" were required by CBI safety rules and one was not provided, the court has

not been directed to any law which indicates that the failure to use a "tie off" was anything more than mere negligence.

In *Bailey v. Hogg,* 547 So.2d 498 (Ala. 1989), Bailey and his wife sued Hogg, a co-employee, and Hooper Concrete, Inc. alleging that their willful conduct caused Bailey's injuries. Hooper had purchased a concrete plant in Georgia and had moved the plant to Greenville, Alabama, where the plant was reconstructed. As a result of an accident while working around the concrete plant, Bailey's thumb was amputated. Bailey alleges that Hooper had received with the plant a safety guard which covered the pulley causing the accident, but Hooper failed to install it. The court held that the failure to install a safety device provided by the manufacturer equates to willful and intentional removal of a safety device for the purposes of § 25–5–11(c)(2). *Bailey,* 547 So.2d at 500. In so holding, the court opined "[t]o hold that the willful and intentional failure to install an available safety guard is not actionable would allow supervisory employees to oversee assembly of new machinery, instruct their employees not to install safety guards, and then, when an employee is injured due to the lack of a safety guard, claim immunity from suit." *Id.*

4. Daniels testified in his deposition to the following:

> Q. What else is there about the safe use of a ladder other than those two things?
> A. After it's put in place, make sure that it's secure.
> Q. Okay. And what do you mean by that?
> A. Either make—somebody be holding it or it's tied off.
> Q. Okay. Now, how do you tie off a ladder that you're going to work off of? What's involved in doing that?
> A. Well, if you—you could tie it any number of ways, get somebody to hold it and climb to the top and tie it off the top to a welding spot or hook it off over the shell with a little hook.
> Q. All right, sir.
> A. Just any different ways. Just let somebody hold it for you.
> Q. What do you tie it off with?
> A. Anything you can get your hands on.
> Q. Sure. Rope?
> A. Anything.
> Q. Chain?
> A. Anything. Yes, sir, rope or chain.
>
> (Daniels' Dep. at 67–68.)

5. In his deposition, Daniels testified to the following:

> Q. Okay. When you do tie a ladder off—and you've told me about what the situation was on that, but when you do tie a ladder off, is there some tie material that stays with the ladder tied on or fixed on it as it moves around, or is it just something you get and use?
> A. Something you get and use.
> Q. So would it be correct that there's not some tie line that stays with the ladder as it goes?
> A. They are now. They got chains on them now. Now, on the last job I was on they put chains on the ladder where you could, you know, have something there.
> Q. All right, sir. Have you ever seen those attached to ladders you've used before that time.
> A. No, sir.
> Q. So that was not something that had been on and taken off; it was something that was added? Did I understand you correctly?
> A. Correct.
>
> (Daniels' Dep. at 157–58.)

The facts in *Bailey* are distinguishable from the facts in the present case. First, "tie offs" were not provided by the manufacturer as a safety device and merely not installed by Fulkerson. In *Bailey*, the manufacturer had provided the safety device, and Hooper had failed to install it. Secondly, there is no evidence that Fulkerson had substantially or materially modified or altered the ladder in question. The court is not persuaded that using a rope or chain to secure a ladder without permanently attaching the chain or rope is a substantial modification to the ladder. However, assuming that adding "tie offs" is a substantial modification, there is no evidence that "tie offs" had ever been used with this particular ladder. In *Bailey*, the concrete plant in question had been moved from Georgia to Alabama, and in doing so, had, at least to some degree been taken apart and reassembled. In so doing, Hooper had greatly modified or had "manufactured" the plant. Fulkerson, although he testified in his deposition as did plaintiff Daniels that "tie offs" were often used with ladders, had never permanently added a "tie off" to a ladder nor had he failed to add a "tie off" provided by the manufacturer. Thus, the court's ruling in *Bailey* is not controlling in this case. To rule that Fulkerson could be held liable for "wrongful removal of a safety device" in violation of § 25–5–11(c)(2) for failure to add a "tie off" to a ladder which had not been received from the manufacturer or required by law would, in the court's view, be contrary to the law of Alabama.

The plaintiffs argue that CBI added "tie offs" to every ladder by requiring in their safety manual that "tie offs" be used with ladders and by providing the materials for "tie offs." In making their argument, the plaintiffs cite *Harris v. Gill*, 585 So.2d 831 (Ala.1991), which held that "the bypassing of a safety device constituted the removal of a safety device for purposes of subsection (c)(2)." *Harris*, 585 So.2d at 839. The court finds that the facts in the present case are materially different from those in *Harris*. The plaintiffs do not suggest that defendant Fulkerson "bypassed" a safety device, but that he failed to use a safety device required by a CBI safety manual. The failure to

follow company policy may be prima facie evidence of negligence, but the court finds that a safety rule requiring the use of a "tie off" without evidence that one was ever used or added to the ladder or absent evidence that a device was provided by the manufacture but never added is unpersuasive as the court considers whether the plaintiffs have met their burden of alleging and proving a prima facie case of a violation of § 25–5–11(c)(2).

In addition, the plaintiffs have failed to put forth any evidence that Fulkerson intentionally removed the safety devices with the knowledge that injury would probably or likely result to Daniels because of the removal. As the plaintiffs pointed out, Fulkerson testified in his deposition that he was aware that not using "tie offs" would create a potentially dangerous situation if a ladder were not properly placed. (Fulkerson Dep. at 21.) Fulkerson further testified that the failure to use a "tie off" could be considered as creating a "dangerous" ladder. (*Id.*) However, the court finds that from Fulkerson's testimony one cannot infer that Fulkerson intended to harm Daniels or that Fulkerson thought that injury to Daniels would likely result. In *Layne v. Carr*, 631 So.2d 978 (Ala.1994), the Supreme Court of Alabama held that a perceived risk of injury was not sufficient for a jury to infer that a co-employee acted with the intent or purpose to injure. *Layne*, 631 So.2d at 982. The court finds that at the very most Fulkerson perceived a potential risk of injury to Daniels, but that the evidence presented to the court in no way indicates that by his actions Fulkerson intended to harm plaintiff Daniels.

Furthermore, as to the fourth element for a prima facie case for a violation of § 25–5–11(c)(2), it is undisputed that any removal of a safety device from the ladder was not a part of a modification or improvement that rendered the safety guard or device unnecessary or ineffective.

Because the plaintiffs have failed to put forth sufficient facts to support a prima facie case for a violation of § 25–5–11(c), summary judgment in favor of defendant Fulkerson is due to be granted.

### Conclusion

In sum, it is CONSIDERED, ORDERED, and ADJUDGED that defendant Mead Coated Board, Inc.'s motion for summary judgment be and the same is hereby GRANTED.

It is further CONSIDERED, ORDERED, and ADJUDGED that defendant Randy Fulkerson's motion for summary judgment be and the same is hereby GRANTED.