INGRAM, Justice.
Daniel Smith, an employee of Reynolds Metals Company (“Reynolds”), was injured while operating a metal grinding machine. Pursuant to Ala.Code 1975, § 25-5-ll(b) and (c)(2), Smith and his wife, Libby Z. Smith, sued Smith’s co-employees Jim Wallace, Marion Rhodes, Carl Stumpe, and Charlie Wilson, alleging willful and intentional failure to maintain a safety device. The trial court entered a summary judgment in favor of the co-employees. The Smiths appeal.
On a motion for summary judgment, the burden is initially on the movant to make a prima facie showing that there is no genuine issue of material fact (i.e., that there is no dispute as to any material fact), and that he is entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P.; McClendon v. Mountain Top Indoor Flea Market, Inc., 601 So.2d 957 (Ala.1992); Elgin v. Alfa Corp., 598 So.2d 807 (Ala.1992). “The burden does not shift to the opposing party to establish a genuine issue of material fact until the moving party has made a prima facie showing that there is no such issue of material fact.” McClendon, at 958; Elgin, at 810-11.
Rule 56 must be read in conjunction with the “substantial evidence rule,” § 12-21-12, Ala.Code 1975, for actions filed after June 11, 1987. See Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). In order to defeat a defendant’s properly supported motion for summary judgment, the plaintiff must present substantial evidence creating a genuine issue of material fact; “substantial evidence” is “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). This Court reviews the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala.1993).
Viewed in a light most favorable to the Smiths, Wilma Corp., supra, the record suggests the following facts:
Smith was an ironworker in Reynolds’s wire, rod, and bar facility and often operated an electric grinding machine (“grinder”) at work. Grinders such as the one used by Smith are used to shape or sharpen metal. The worker holds the metal against the machine’s abrasive wheel, which rotates at an extremely high rate of speed. A “tool rest” on the grinder steadies the worker’s hands as the metal piece is slowly forced into contact with the abrasive wheel. The tool rest is a small metal shelf attached to the grinder frame and is situated between the wheel and the worker’s hands. A very small space must be maintained between the tool rest and the abrasive wheel. The purpose of maintaining that space (or “tolerance”) at a minimum is to protect the worker’s hands from being drawn down into the wheel. It also allows the worker to grind (he metal piece with more precision. If the tolerance of the tool rest expands because of wear and tear on the grinding wheel, the possibility of finger and hand injury is significantly increased. The tool rest must be adjusted or replaced to restore the appropriate tolerance when the grinding wheel is reduced in size or shape by being worn down.
On May 30,1990, Smith was using a grinder to sharpen an iron pin that was to be placed into a large hinge. The required tolerance on Smith’s tool rest was ⅜ inch, according to safety guidelines established by the Occupational Safety and Health Administration, the American National Standards Institute, the National Safety Council, and Reynolds’s plant regulations. However, the tolerance on Smith’s machine at the time of his accident was between ½ inch and 1 inch, because deep furrows had been rutted into the wheel through long periods of use without its being “dressed,” i.e., reshaped so as to provide a smooth and balanced grinding surface. While Smith was attempting to grind the iron pin, his left hand was pulled into the wheel, and his thumb was severed.
This grinder was in place in the wire, rod, and bar facility when Smith began working' there in 1987. Smith stated that the grinder had not been serviced during the three years before the accident that he had worked in that area of the Reynolds plant. Smith fur *1036 ther stated that in those three years his department had not had a monthly safety meeting at which one could turn in a formal complaint about the grinder’s condition. According to Smith, he had asked Carl Stumpe, the plant safety manager, to service the grinder, but Stumpe told him that “he wouldn’t guarantee ... that he could get it fixed”; Stumpe denies having this conversation. Marian Rhodes, the general field maintenance supervisor, stated that the grinder was not listed on Reynolds’s files before the accident. According to Rhodes, the grinder had been “bootlegged,” that is, obtained from a group of other Reynolds machines that had been taken out of service, placed in a salvage area, and then brought back into service. It is not clear who brought the grinder back into service. Because it was bootlegged, the grinder was not officially in service, according to Reynolds’s equipment records. It did not have an operating number, and a work order for repair on the grinder could not be made without an operating number.
In spite of the absence of an operating number for the grinder, Stumpe, on March 27,1990, sent a monthly safety report to Jim Wallace, the shop and field maintenance superintendent, with a copy also sent to others, including Charlie Wilson, the industrial relations manager; in that report Stumpe noted that the grinder’s wheel needed to be dressed. Rhodes, although he said he was unable to recall whether he had received a copy of the report, stated that he would normally receive a copy of a safety report and “possibly” did receive this report. However, no repairs were made. Approximately three days before the accident, a machinist came to Smith’s workstation and inspected the grinder, but no repairs were made. After Smith’s injury, Stumpe issued a report, which stated:
“There were several violations of our safety rules that contributed to the accident.
“The tool rest on the grinder was not properly dressed. This grinder had been written up for this violation during the March safety inspection of this area.... Apparently this grinder has been overlooked.
“The tool rest on the grinder was not properly adjusted. The spacing between the tool rest and the surface of the rock varied from ½" to 1". Tool rests should be kept within ⅜" of the rock. With this small gap there is little way that fingers or the piece being ground can be caught between the rock and the tool rest.
[[Image here]]
“During the investigation of this accident ... I was told that the portion of the [ironworker] crew that works in the [wire, rod, and bar] shops have not had a safety meeting in over 2 years. The employees in the crew that are assigned to Sheet Finishing were recently invited to a Sheet Finishing Maintenance meeting. They were shown a safety videotape on grinders.
[[Image here]]
“... Please assure that all safety rules are followed and that all maintenance employees are attending monthly safety meetings. ...”
(Emphasis in original.)
After Smith’s injury, the machine was taken out of service, assigned an operating number, and repaired.
The Smiths’ claims are based on § 25-5-11(b) and (c)(2), Ala.Code 1975; those subsections provide, in pertinent part, the following:
“(b) If personal injury or death to any employee results from the willful conduct, as defined in subsection (c) herein, of any ... employee of the same employer, ... the employee shall have a cause of action against the person....
“(c) As used herein, “willful conduct’ means any of the following:
[[Image here]]
“(2) The willful and intentional removal from a machine of a safety guard or safety device provided by the manufacturer of the machine with knowledge that injury or death would likely or probably result from the removal; provided, however, that removal of a guard or device shall not be willful conduct unless the removal did, in fact, increase the danger in the use of the machine and was not done for the purpose of repair of *1037 the machine or was not part of an improvement or modification of the machine which rendered the safety device unnecessary or ineffective.”
In Moore v. Reeves, 589 So.2d 173, 177 (Ala.1991), this Court defined “safety device,” as that term is used in § 25-5-11(c)(2):
“[T]hat which is provided, principally, but not exclusively, as protection to an employee, which provides some shield between the employee and danger so as to prevent the employee from incurring injury while he is engaged in the performance of the service required of him by the employer; it is not something that is a component part of the machine whose principal purpose is to facilitate or expedite the work.”
In Moore, this Court held that a co-employee’s failure to maintain or repair a safety device is the equivalent of the removal of that safety device, for purposes of § 25-5-11(c)(2). The Moore Court stated that “[t]o hold otherwise would allow supervisory employees to neglect the maintenance and repair of safety equipment provided to protect co-employees from injury, which by its very nature is a clear violation of public policy.” Moore, 589 So.2d at 178-79.
The first question to be determined is whether the tool rest on the grinder is a “safety device” under § 25-5-ll(c)(2), as the term is defined in Moore, supra. Wallace, Rhodes, Stumpe, and Wilson contend that the tool rest is not a safety device. We disagree.
The principal purpose of the tool rest is not only to “facilitate or expedite” the work; the purpose is two-fold, with the second purpose being to protect the worker’s hands from the grinding wheel while the machine is in use. The fact that the tool rest also helps the worker to steady the piece being ground does not detract from the safety purpose. The record indicates that, had the tolerance on the grinder been properly maintained by an adjustment of the tool rest, and had the grinder wheel been dressed, Smith’s injury probably would not have occurred. The regulations requiring a ⅜-inch tolerance serve to prevent accidents such as Smith suffered. The tool rest is provided, although not exclusively, for the safety of the worker; therefore, we hold that the tool rest is a safety device within the meaning of § 25-5-ll(c)(2). Moore, supra.
We further hold that the evidence was sufficient to create a genuine issue of material fact, and, therefore, the summary judgment for Wallace, Rhodes, Stumpe, and Wilson was inappropriate. We note that, according to Reynolds’s job descriptions, Wallace, by virtue of his position as the shop and field maintenance superintendent, was responsible for “[monitoring the plant] for unsafe conditions and potential hazards [and for directing] corrective action.” Rhodes, as the general field maintenance supervisor, had among his duties “[promoting] safety and housekeeping [and developing and coordinating the] safety program.” Stumpe, as plant safety manager, was responsible for “[investigating] safety complaints ... [and monitoring] the workplace for unsafe conditions.” Wilson, as industrial relations manager, was also responsible, in part, for “[promoting] ... safe work practices” and “[managing] the activities of the Safety [Department].”
As stated above, according to Smith, Stumpe inspected the grinder; Stumpe later indicated in his safety report that the grinder wheel needed dressing. As further noted above, notice of the needed repair had been given in copies of the safety report issued to Wallace and Wilson; Rhodes, although not listed on the report, testified that he “possibly” received a copy. The fact that the grinder wheel was in disrepair would necessarily alter the tolerance and thus the effectiveness of the tool rest in preventing Smith’s injury. Stumpe’s report made after the accident supports this conclusion. All of the co-employee defendants — Wallace, Rhodes, Stumpe, and Wilson — were in positions of safety responsibility. We hold that there are genuine issues of material fact regarding whether Wallace, Rhodes, Stumpe, and Wilson, as reasonable men, would have known that Smith’s injury was substantially certain to follow from a failure to repair the grinder. The evidence provides a sufficient basis from which a jury could conclude that, but for their failure to maintain the tool rest (as well as the grinding stone) so as to achieve the *1038 proper tolerance on the grinder, Smith would not have been injured. Therefore, the trial court erred in entering the summary judgment in favor of Stumpe, Wallace, Rhodes, and Wilson. That judgment is reversed.
REVERSED AND REMANDED.
ALMON, SHORES, HOUSTON, COOK and BUTTS, JJ., concur.
MADDOX, J., dissents.