On Application for Rehearing
The opinion of this court issued December 30, 2004, is withdrawn, and the following is substituted therefor. *Page 1068 
Lytricia King, who had been employed by Russell Corporation since 1996, began working as a BRB machine operator at a Russell Corporation plant in Brundidge in April 2001. The BRB machine is a machine that processes fabric used in manufacturing textiles; the fabric is threaded into the machine, stretched, and then cut out by a press based on the pattern loaded into the machine. Although she was informed that she would receive two weeks of training on the BRB machine, King was trained for only one week. The week following King's training was the week-long Easter holiday; when King returned to work on April 22, 2001, she was informed that her training was complete and that she would work on the BRB # 4 machine alone.
On April 22, 2001, King began her shift at approximately 5:30 a.m. She testified that when she first arrived she had no work awaiting her, so she used the time to go over the notes she took during her training. Once she was given her pattern and fabric, King proceeded to thread the fabric into the BRB # 4 machine. According to King, the first ply of her fabric threaded without a problem. The second ply of King's fabric, however, jammed in the machine, requiring King to pull the fabric through. She opened the door of the machine to access the fabric. According to King, the rollers of the machine stopped moving when she opened the door of the machine to dislodge the fabric. King said that she squatted down and pulled on the fabric to dislodge it. She said that she needed balance, so she placed her left hand on a roller, which was not moving at the time. She said that she then heard "that noise" and that when she stood up her hand was between the rollers, which had started suddenly when she pulled on the fabric to dislodge it.
King's hand was severely injured and she sought workers' compensation benefits from Russell Corporation. King then sued Sharon Leach, the plant manager; Valance Patterson, the finishing and cutting department manager; and Tommy Cape, the plant equipment and maintenance supervisor (hereinafter collectively referred to as "the co-employees"), alleging that they had engaged in willful conduct under Ala. Code 1975, § 25-5-11(c)(2), by failing to maintain or repair a safety device on the BRB # 4 machine. The co-employees moved for a summary judgment, and the trial court entered a summary judgment in their favor. King appealed to the Alabama Supreme Court, which transferred the case to this court, pursuant to Ala. Code 1975, § 12-2-7(6).
We review a summary judgment de novo; we apply the same standard as was applied in the trial court. A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. A party moving for a summary judgment must make a prima facie showing "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Rule 56(c)(3); see Lee v. City of Gadsden, 592 So.2d 1036, 1038
(Ala. 1992). If the movant meets this burden, "the burden then shifts to the nonmovant to rebut the movant's prima facie showing by `substantial evidence.'" Lee, 592 So.2d at 1038 (footnote omitted). "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 *Page 1069 
(Ala. 1989); see Ala. Code 1975, § 12-21-12(d). See West,547 So.2d at 871, and Bass v. SouthTrust Bank of Baldwin County,538 So.2d 794 (Ala. 1989), for further discussion of the application of the summary-judgment standard.
The machine on which King was injured, the BRB # 4 machine, is a large machine with several parts. King was working on the end of the machine into which the fabric that would be cut into pattern pieces is threaded. The operator of the machine must thread the fabric manually through the rollers. The machine has both an automatic and a manual mode; when the machine is in the manual mode, the rollers will not activate unless a button is depressed. King testified that she was never taught about changing the machine to manual mode, so the machine was in automatic mode at the time of the accident. When the machine is in automatic mode, the rollers will stop if the door of the machine is opened. The manufacturer of the machine designed a microswitch and cam system that, when activated by the door opening, halts the rollers.
The co-employees submitted King's deposition and their own depositions in support of their motions for a summary judgment. As noted above, King testified about how the accident occurred. She said that the rollers on the machine stopped when she opened the door to the machine to dislodge the fabric. When questioned about whether she had ever seen the rollers of a BRB machine moving when the door to the machine was open, King replied that she had not. King also testified that she had never been told that the BRB machine had a manual mode or that she should put the machine in manual mode when she needed to dislodge a fabric jam; had the machine been placed in manual mode, the rollers would not have engaged.
Leach testified that she was the plant manager. She said that Tommy Cape was in charge of the preventative-maintenance program at the plant and that she knew that the machines were regularly inspected. However, she did not know if the preventative-maintenance checklist for the BRB machine originated with the manufacturer or with the maintenance department at the plant. According to Leach, no maintenance other than daily adjustments or repairs were made to the BRB # 4 machine. Leach said that she did not recall that the BRB # 4 machine had been out of service for a time before the accident.
Leach also testified regarding the procedure used when a machine required maintenance or repair; she explained that an operator would notify his or her supervisor about the problem and that the supervisor would write up a work ticket. Leach further testified that as plant manager she could review work tickets but that she normally did not. Leach also commented that monthly safety meetings were conducted at the plant.
Leach said that she had never operated a BRB machine and that she was not familiar with how the machine operated other than knowing that fabric was threaded through the machine and that a pattern was cut from the fabric. She said that she understood that the cam and microswitch system was a safety device but that she was unaware of how the mechanism worked. According to Leach, since the April 2001 accident, the maintenance technicians are required to check the BRB machines at the beginning of each shift to be certain that the rollers stop when the door of a machine is opened.
Patterson testified that, as the finishing and cutting department manager, his job was to supervise the first-line supervisors. According to Patterson, the first-line supervisors *Page 1070 
would report equipment problems to him. He said that his job encompassed making certain that work orders were completed in a timely manner. Since the time of the accident, Patterson said that his duties have been expanded to include ensuring that the first-line supervisors conduct their monthly safety meetings. In addition, Patterson commented that if he personally viewed what he perceived as a safety problem, he would discuss the problem with the first-line supervisor and have a work ticket written up; he also said that he would speak to Cape about any safety issues he noticed.
Patterson said that there were no discussions regarding safety issues with the BRB # 4 machine before King's accident. He said that, although the machine had been out of service for a time for reasons unknown to him, he knew of no problems with the BRB # 4 machine. According to Patterson, although he was not certain that the cam and microswitch were listed on the preventative-maintenance checklist, they were to be checked monthly as a part of the preventative-maintenance program. Patterson also said that he recalled a similar accident involving a BRB machine and its cam and microswitch system failing at another Russell Corporation plant, but he did not know why the cam and microswitch system on BRB # 4 failed.
According to Cape, his job involves "mak[ing] sure that maintenance is carried out and repairs are made in a timely manner and that preventative maintenance [is] conducted on [the plant's] equipment." He said that he also takes care of safety issues, typically without seeking Leach's prior approval. However, he explained that if he wanted to modify a machine or if a repair was expected to be costly, he would need her prior approval.
Cape stated that he had discussed safety issues in relation to the BRB machines on other occasions. He specifically mentioned that the BRB # 4 machine was a shock hazard at one time. He then stated that the cam and microswitch system on the BRB machines was a safety device to protect the machine and was not primarily meant to protect the operator. He further explained this statement by saying that the function of the cam and microswitch system was to open the door if fabric became lodged in the machine so that the rollers would stop moving and the machine would not be damaged.
Cape testified that he was informed by the maintenance personnel who assisted in extricating King's hand from the machine that the cam had "jumped off the cam facing" or that the cam and microswitch had separated. Cape also testified that he had no knowledge of any previous problems with the cam or microswitch on the BRB # 4 machine. He further testified that the only way he would have known of any problem with a cam or microswitch on any of the BRB machines is if a machine operator reported that the rollers continued to move when the door of the machine was opened.
According to Cape, the cam and microswitch system requires no specific maintenance. In addition, he said that there was no way to adjust the setting of the microswitch. He said he was familiar with microswitches "failing" but that he had never had one separate from the cam facing as the one on the BRB # 4 machine reportedly did. Cape further testified that maintenance for the cam and microswitch system would be ordered based on an operator's report that either the rollers continued to move even when the door was open or the machine would not operate at all.
Cape said that, after the accident, John Kennedy and Bryant Waugh, representatives from Bierrebi International, the manufacturer of the BRB machine, came to the *Page 1071 
plant at his and Leach's request. Cape testified that he requested that Kennedy and Waugh come to the plant because he wanted to get the door gap, which is the distance the door must be open to trigger the microswitch to engage the cam and stop the rollers, properly set; Cape said that before the accident he was unsure of what the door gap should be. According to Cape, Kennedy and Waugh inspected the BRB # 4 machine. Cape said that Kennedy and Waugh explained to Cape and his technicians that the door-gap setting was incorrect and that it should be set at 1/8 of an inch.
In support of her opposition to the co-employees' summary-judgment motions, King filed Waugh's affidavit. Waugh explained that he and Kennedy had come to the plant to inspect the BRB # 4 machine after the accident and to help determine the cause of the accident and aid in the prevention of future accidents. Waugh further stated in his affidavit as follows:
 "During our visit it became quite obvious that the mechanics charged with the maintenance of this particular machine . . . were not very proficient. In fact, we were quite shocked to learn that these Russell mechanics apparently did not know how to properly set the machines and the safety devices/features associated therewith.
". . . .
 "These same mechanics became quite humbled when we explained to them how far off the settings on this particular machine were. We had to, in fact, provide the tools for them to make these adjustments as they did not have the proper tools.
". . . .
 "The maintenance problems that were discovered on May 3, 2001, with regard to this particular machine included the fact that the door opening setting was incorrect, the setting gap on the squeeze rollers was incorrect, the cam and micro switch setting was incorrect and, the door which shielded the user from the turning rollers would be allowed to open three or four inches in automatic with the fabric running before the rollers would stop moving.
 "However, with regard to this particular accident the major problem with maintenance was that the cam and micro switch setting was incorrect."
At the hearing on the motions for a summary judgment, King attempted to submit a letter written by Waugh to Leach in October 2001. The trial court refused to accept this letter on the basis that it was not timely submitted, see Rule 56(c)(2), Ala. R. Civ. P.; however, we note that this same letter was already submitted as an exhibit to Cape's deposition. The letter simply reiterates the problems with the maintenance of the machine discovered during Waugh's visit, and it is substantially identical to the affidavit testimony provided by Waugh.
The trial court also conducted a transcribed hearing at which the parties presented their legal arguments concerning the burden of proof borne by King and whether there was substantial evidence creating a genuine issue of material fact relating to the co-employees' failure to repair a safety device. Specifically, the co-employees argued that King was required to present evidence creating a genuine issue of material fact concerning whether the co-employees were aware that the safety device at issue in the present case required repair or maintenance.
Section 25-5-11(c)(2), Ala. Code 1975, reads:
 "(c) As used herein, `willful conduct' means any of the following:
". . . . *Page 1072 
 "(2) The willful and intentional removal from a machine of a safety guard or safety device provided by the manufacturer of the machine with knowledge that injury or death would likely or probably result from the removal; provided, however, that removal of a guard or device shall not be willful conduct unless the removal did, in fact, increase the danger in the use of the machine and was not done for the purpose of repair of the machine or was not part of an improvement or modification of the machine which rendered the safety device unnecessary or ineffective."
The Alabama Supreme Court has commented that "[s]ection25-5-11(c)(2) cannot be construed to allow a co-employee action in every situation where an employee is injured on the job. The legislature expressly limited exceptions to the exclusivity of the workers' compensation scheme." Layne v. Carr,631 So.2d 978, 982 (Ala. 1994). Instead, to be successful in an action under § 25-5-11(c)(2), a plaintiff must prove:
 "1. The safety guard or device [was] provided by the manufacturer of the machine;
 "2. The safety guard or device [was] removed from the machine;
 "3. The removal of the safety guard or device . . . occurred with knowledge that injury would probably or likely result from that removal; and
 "4. The removal of the safety guard or device [was] not . . . part of a modification or an improvement that rendered the safety guard or device unnecessary or ineffective."
Harris v. Gill, 585 So.2d 831, 835 (Ala. 1991).
The term "removal" has been extended to include the failure to install a safety guard or device, Bailey v. Hogg, 547 So.2d 498
(Ala. 1989), the bypassing of a safety guard or device, Harris,585 So.2d at 837, and the failure to repair or maintain a safety guard or device, Moore v. Reeves, 589 So.2d 173 (Ala. 1991). To defeat a motion for a summary judgment on her claim against her co-employees, King must have presented substantial evidence creating a genuine issue of material fact as to whether her co-employees "willfully and intentionally [failed to repair] the safety guard or device . . . and did so with knowledge that injury would likely or probably result from [that failure]."Harris, 585 So.2d at 835.
King argues that this court's opinion in Haddock v. Multivac,Inc., 703 So.2d 969, 972 (Ala.Civ.App. 1996), supports a reversal of the summary judgment in the co-employees' favor in the present case. This court did reverse a directed verdict entered in favor of a co-employee in Haddock, citing as authority Moore v. Reeves, 589 So.2d at 178-79. We disagree, however, with King's conclusion that Haddock compels a reversal of the summary judgment for the co-employees in the present case.
The facts as discussed in our opinion in Haddock indicated that a safety guard on the machine that injured the plaintiff, Haddock, had been bypassed by a jumper wire at some time before the accident; however, it was not apparent whether the safety device had been bypassed before or after the machine was brought to the plant at which Haddock worked. Haddock,703 So.2d at 972. In Haddock, "[s]everal workers from the plant testified that they never saw the machine operate with the guard working and that the guard was disengaged from the time the machine went into operation" at the plant. Id. The defendant co-employee, McClanahan, testified that he was unaware that the guard *Page 1073 
did not work. Id. Another machine operator "testified that he saw maintenance personnel watch the machine operating with the guard off when they were setting up the machine." Id. This court determined that Haddock had presented substantial evidence creating a genuine issue of material fact and concluded, therefore, that the directed verdict in favor of McClanahan was inappropriate. Id.
The Haddock court based its conclusion, in part, on a statement found in Moore, which was quoted in Haddock:
 "`To hold otherwise would allow supervisory employees to neglect the maintenance and repair of safety equipment provided to protect co-employees from injury, which by its very nature is a clear violation of public policy.'"
Haddock, 703 So.2d at 972 (quoting Moore,589 So.2d at 178-79). Thus, King argues that supervisory co-employees may be liable for their failure to maintain or repair a safety device merely by virtue of their positions of authority. That is, she argues that a co-employee's knowledge or awareness of the necessity of repairing or maintaining a safety device is immaterial to his or her liability in a co-employee suit under §25-5-11(c)(2). We disagree.
In Moore, our supreme court considered whether a security guard's co-employees could be liable under § 25-5-11(c)(2) for failing to repair a door-closing mechanism on an automobile used by a security guard on patrol. Moore, 589 So.2d at 176. An examination of Moore reveals that that opinion focused on two arguments: one concerning whether the door-closing mechanism was a safety device and one concerning whether the "willful and intentional failure to maintain and/or repair a `safety guard' or `safety device'" was tantamount to removal of such a guard or device. Moore, 589 So.2d at 178. The court answered both questions in the affirmative. Id. The Moore opinion indicates that at least two of the defendants had knowledge for several months before the plaintiff's accident that the door-closing mechanism was inoperable; the knowledge of the other two defendants was not mentioned. Moore, 589 So.2d at 175.
However, the arguments presented to the Moore court did not relate to the question whether supervisors, merely by virtue of their positions, may be liable in a co-employee suit without regard to their knowledge or awareness of the need to repair or maintain a safety device. The sentence in Moore that was quoted in Haddock regarding the neglect of necessary maintenance was central to the Moore court's decision to expand the term "removal" as used in § 25-5-11(c)(2) to include the failure to maintain or repair a safety device. Accordingly, the sentence does not mean, as urged by King, that supervisors are automatically liable when a safety device is not maintained or repaired properly. An examination of other co-employee cases involving the removal or failure to maintain a safety device reveals that in cases other than Haddock the determination of co-employee liability under § 25-5-11(c)(2) has indeed rested on the knowledge or awareness of the co-employee of the necessity for maintenance or repair of the safety device in question.
For example, our supreme court reversed a summary judgment in favor of four co-employees, one of whom had authored and three of whom had received a memorandum indicating that the safety device in question required repair. Smith v. Wallace, 681 So.2d 1034
(Ala. 1995). Daniel Smith sued his co-employees when he was injured by a grinder. Smith, 681 So.2d at 1035. According to Smith, the grinder had not been serviced in at least three years; in addition, Smith testified that he had made a request to the plant *Page 1074 
safety manager, Carl Stumpe, that the grinder be serviced.Smith, 681 So.2d at 1036. Although Stumpe denied that he had been asked to service the grinder, he had stated that the grinder needed servicing on a monthly safety report in March 1990, only two months before Smith's accident. Id. Stumpe sent this safety report to Jim Wallace, the shop and field maintenance superintendent, and Charlie Wilson, the industrial relations manager; Marian Rhodes, the general field maintenance supervisor, stated that he normally received a copy of the monthly safety report and possibly received the March 1990 report. Id. Based on this evidence, the supreme court concluded that a genuine issue of material fact existed regarding whether the co-employees had knowledge that their failure to repair the grinder would likely cause injury and, thus, precluded a summary judgment in favor of the co-employees. Smith, 681 So.2d at 1037; §25-5-11(c)(2).
Our supreme court recently reversed a summary judgment in favor of a co-employee because the evidence created a genuine issue of material fact regarding whether the co-employee knew of the inoperable condition of the safety guard in question at the time of the accident. Ex parte Canada, 890 So.2d 968 (Ala. 2004). The plaintiff, Canada, was injured because the safety guard on the table saw he was using was broken. Ex parte Canada,890 So.2d at 971. Vic Goode, the co-employee, testified that he inspected the safety guard at the beginning of each day. Exparte Canada, 890 So.2d at 974. Goode also described the safety guard in detail, indicating that it covered both sides of the blade. Ex parte Canada, 890 So.2d at 972. Canada testified, however, that on the day of the accident and on other days he had used the saw, the plastic safety guard was "dangling on the left side of the blade" and that there was no guard covering the right side of the blade. Ex parte Canada, 890 So.2d at 972. Our supreme court concluded that this contradictory evidence created a genuine issue of material fact as to whether Goode knew of the condition of the safety guard; thus, the summary judgment in favor of Goode was inappropriate. Ex parte Canada,890 So.2d at 973.
We believe that both Smith and Ex parte Canada preclude the conclusion that King asserts is required under Haddock — that supervisory co-employees can be liable under § 25-5-11(c)(2) without regard to their knowledge of the need for maintenance or repair of a safety device. That is, we conclude that a supervisory co-employee's knowledge of the need for repair or maintenance is not only not immaterial, but is instead a key element of co-employee liability under § 25-5-11(c)(2).
In addition, requiring that a co-employee have knowledge of a need for maintenance or repair of a safety device before being held liable under § 25-5-11(c)(2) is consistent with the legislature's express intent in enacting § 25-5-11(c). The legislature's use of the words "willful and intentional" before the word "removal" in § 25-5-11(c)(2) was purposeful. The legislature expressly found co-employee actions based on the negligent or wanton conduct of such co-employees to be "contrary to the intent of the Legislature in adopting a comprehensive workers' compensation scheme" and that such suits were "producing a debilitating and adverse effect on efforts to retain existing, and to attract new industry to this state." Ala. Code 1975, §25-5-14. Because of these and other stated reasons, the legislature provided to co-employees limited immunity "from civil liability for all causes of action except those based on willful conduct." Id.
To allow co-employee liability to be premised on §25-5-11(c)(2) when a co-employee *Page 1075 
had neither notice that the safety device was not working properly nor notice that the safety device required a specific type of maintenance to ensure that it would work properly more closely resembles a suit based on that co-employee's negligence rather than his or her willful and intentional conduct. The co-employees in the present case did not know what maintenance was necessary to ensure the proper working of the cam and microswitch system. While such ignorance may be irresponsible and negligent, it is not a sufficient basis for co-employee liability under § 25-5-11(c)(2). Thus, we conclude that the summary judgment in favor of the co-employees in the present case was proper.
OPINION OF DECEMBER 30, 2004, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED.
THOMPSON, PITTMAN, MURDOCK, and BRYAN, JJ., concur.